Theodore F. Vanderlaan and Kathleen M. Vanderlaan v. Commissioner.
Vanderlaan v. Commissioner
Docket No. 85249.
United States Tax Court
T.C. Memo 1962-130; 1962 Tax Ct. Memo LEXIS 174; 21 T.C.M. (CCH) 676; T.C.M. (RIA) 62130; May 31, 1962
Ethan B. Stroud, Esq., 2808 Southland Center Bldg., Dallas, Tex., Jack W. Hawkins, Esq., and Albert A. Helfand, Esq., for the petitioners. David E. Mills, Esq., for the respondent. SCOTT Memorandum Findings of Fact and Opinion SCOTT, Judge: Respondent determined a deficiency in petitioners' income tax for the year 1957 in the amount of $40,845.91. The issues for decision are: (1) Whether petitioners improperly reported income from oil leases in the taxable year 1957 in the amount of $73,124.59. Petitioners' primary position is that they renounced all claim to these amounts prior to the end of the taxable year 1957, and their alternative contention is that such amounts were received by them subject to a constructive trust. (2) In the alternative, was the *175 amount of $46,868.36 of the $73,124.59 received by petitioners from these leases and reported as taxable income, pledged for development of an oil and gas property and, therefore, not taxable income to petitioners. (3) Whether petitioners are entitled to a deduction in the year 1957 in the amount of $10,540.74 for costs incurred in the settlement of a lawsuit. (4) In the alternative, if the $10,540.74 is not deductible, did $4,335.42 of this amount represent salary reported by petitioners as income in 1957 which in fact they did not receive. (5) Whether the amount of $18,000 reported by petitioners as gains from the sale of leases was ordinary income received in 1957 as a drilling contribution. (6) Whether petitioners are entitled to a deduction in 1957 in the amount of $57,852.94 for intangible oil well drilling costs. Another issue raised by the pleadings has been conceded by petitioners. Findings of Fact Some of the facts have been stipulated and are found accordingly. Petitioners, Theodore F. Vanderlaan (hereinafter referred to as petitioner) and Kathleen M. Vanderlaan, husband and wife residing at Dallas, Texas, filed a joint income tax return for the year 1957 *176 with the district director of internal revenue at Dallas, Texas. Kathleen M. Vanderlaan is involved herein only by reason of having filed a joint return with her husband. Petitioner's books were kept and his return for the year 1957 filed on a cash receipts and disbursements basis. On April 30, 1956, Laan-Tex Oil Corporation (hereinafter referred to as Laan-Tex), a corporation of which petitioner was president and a stockholder, entered into an agreement with New Idria Mining and Chemical Company (hereinafter referred to as New Idria) wherein the assets subject to the liabilities of Laan-Tex were transferred to New Idria in exchange for 250,657 shares of New Idria common stock. As a result of this transaction petitioner acquired 102,979 shares of New Idria stock. Subsequent to April 30, 1956, petitioner sold 35,629 shares of New Idria stock on the open market and disposed of 12,350 shares to other interested holders during the year 1957, leaving him with 55,000 shares at the close of the year 1957. Under the agreement between Laan-Tex and New Idria, the former delivered to the latter its balance sheet as of the close of business on April 1, 1956, which Laan-Tex represented to disclose *177 fully and correctly its assets and liabilities. There was attached to the agreement a schedule which Laan-Tex represented correctly and completely described all of its property and assets. Section 8 of this agreement provided as follows: SECTION 8. The consummation of the sale herein provided for shall not be deemed to limit the duration of the various representations, warranties and covenants of the parties hereto herein contained, all of which shall continue beyond the Closing Date, notwithstanding any investigation made by either party hereto. In the event we shall be required to satisfy debts or obligations of your Corporation not disclosed on your balance sheet referred to in Section 1(b), including any federal or state income tax liability in excess of the provisions therefor reflected on your said balance sheet, or incur expense in the defense of any asserted debts or obligations of your Corporation not so disclosed, or suffer any loss, cost or damage because of the inaccuracy of any of your representations, you agree to surrender to us shares of our stock issued to you at the rate of $2.00 per share to a dollar amount necessary to make good any such undisclosed obligations *178 or liabilities; provided, however, that nothing in this Section 8 or elsewhere herein this Agreement contained shall require any adjustment unless the aggregate of all adjustments shall exceed $5,000, or permit us to make any charge against you after the close of business on May 1, 1957. Laan-Tex was in the business of developing producing properties in oil or gas in and around the State of Texas. New Idria had no personnel equipped for conducting an oil and gas business or operating the properties acquired from Laan-Tex or other similar properties acquired by New Idria at about the same time from other sources. At or about the time of purchasing the assets of Laan-Tex, on June 15, 1956, New Idria elected petitioner as vice president and created an oil and gas division for the operation of the properties acquired from Laan-Tex and other properties and the conducting of an oil business. Petitioner was placed in charge of this division of New Idria with offices in Dallas, Texas. Petitioner on his 1957 income tax return reported salary received from New Idria in the amount of $12,499.92. In the year 1957 petitioner as vice president of New Idria was approached by Glenn T. Lang, who *179 was engaged in the business of brokering oil and gas leases. Lang informed petitioner that the Alps Oil and Gas Company had been transferred leases in Crane County, Texas, known as the Waddell and McKnight leases by the Gulf Oil Corporation with a retention by Gulf Oil Corporation of a one-sixteenth overriding royalty. Lang informed petitioner that Alps Oil and Gas Company was considering entering into an agreement with some other company to drill on the Waddell and McKnight leases for an interest therein (an arrangement commonly referred to as a farmout). Petitioner called by telephone David Van Alstyne, the chairman of the board of directors of New Idria, whose offices were in New York City, and discussed with him the farmout of the Waddell and McKnight leases. Petitioner made an arrangement on behalf of New Idria with a man from California named Erickson to put up the money for drilling and development of the Waddell and McKnight leases and thereafter a written agreement between Erickson and New Idria was entered into. Alps Oil and Gas Company assigned the Waddell and McKnight leases to New Idria subject to a one-sixteenth overriding royalty in Gulf Oil Corporation and a one-sixteenth *180 overriding royalty in Alps Oil and Gas Company. Thereafter, petitioner caused New Idria to assign one-eighth of the working interest in the Waddell and McKnight leases to Glenn T. Lang, Jr., three sixty-fourths of the working interest to Willard McClain, thirteen sixty-fourths of the working interest to Morris I. Jaffe, trustee for Theodore F. Vanderlaan, and one-eighth of the working interest to Da-Mik Oil Company (hereinafter referred to as Da-Mik). Da-Mik was a trade name. Petitioner on his 1957 income tax return, on a separate Schedule C, reported the income and expenses of Da-Mik, listing it as a business name for his business with its principal business activity being discovery and development of oil and gas properties. The net profit of this business operation in the year 1957 as shown on petitioner's income tax return was $10,148.25. Da-Mik was operated by petitioner's two sons. Erickson in accordance with his agreement paid funds to New Idria and petitioner caused New Idria to turn over certain of these funds to Da-Mik, and Da-Mik to pay certain costs of drilling and equipping wells on the McKnight and Waddell leases. New Idria terminated petitioner's employment on or about *181 June 9, 1957. At the time of termination of petitioner's employment by New Idria, other officers of New Idria took all the books and records of New Idria then in possession of petitioner and removed them to an office in Graham, Texas. On September 18, 1957, New Idria filed a complaint in the United States District Court for the Northern District of Texas against petitioner; petitioner's two sons, Theodore David Vanderlaan and Michael Vanderlaan, individually and "d/b/a the Da-Mik Oil Co."; W. Dale Martin; Laan-Tex Oil Corporation; and certain stockholders of Laan-Tex Oil Company, individually and as representatives of other common stockholders of Laan-Tex; and Texas Bank and Trust Company of Dallas. The complaint contained four counts. The first count alleged that at the time of delivery of the balance sheet of Laan-Tex to New Idria and at the time of the execution of the agreement whereby New Idria purchased the assets of Laan-Tex, petitioner and Martin personally knew that the balance sheet was inaccurate, incorrect, and fraudulent and did not fairly represent the financial condition of Laan-Tex. The first count of the complaint contained five specific allegations of overstatement *182 of assets or understatement or omission of liabilities and one allegation of a payment of a liability of Laan-Tex which petitioner caused to be made with New Idria funds. The total amount of these items was alleged to be $289,795.22, and New Idria sought recovery in that amount from petitioner, Martin, Laan-Tex, and the other stockholders of Laan-Tex jointly and severally. Count two of the complaint alleged that New Idria entered into agreements with Alps Oil Company for acquisition of farmouts of the McKnight and Waddell leases and by such agreements became entitled to a working interest in the leases of seven-eighths of seven-eighths. New Idria alleged that it entered into an agreement with Erickson whereby Erickson agreed to provide the funds for drilling and equipping the wells in consideration of an assignment of three-eights of the working interest in the leases with the provision that if a well were nonproductive, the money provided by Erickson for such well would be returned to him in lieu of the three-eighths interest in such well. This count of the complaint alleged that petitioner, while vice president of New Idria and owing a duty of faithfulness to it, without the knowledge *183 or authorization of New Idria, caused assignments to be made by New Idria by executing such assignments in its name purporting to act as its vice president, such assignment being of one-eighth of the working interest to Lang, three sixty-fourths of the working interest to McClain, thirteen sixty-fourths of the working interest to Morris I. Jaffe, trustee, and one-eighth of the working interest to Da-Mik. The complaint did not challenge the assignments to Lang and McClain upon information that these persons had rendered services to New Idria as agents or brokers but alleged that the assignments to Morris I. Jaffe, trustee, and Da-Mik were wholly without consideration, were made to or for the benefit of petitioner in violation of his duty to New Idria, and constituted a direct misappropriation of New Idria's property to his own personal use and benefit. This count of the complaint alleged that Morris I. Jaffe was trustee for petitioner, that Da-Mik was merely a name compounded of the names of the two minor sons of petitioner, and that Da-Mik was a fictional name employed by petitioner for the benefit of his children or employed by his children. This count alleged that there was no consideration *184 for the assignments to Morris I. Jaffe, trustee, or to Da-Mik and that the letters executed by petitioner, whereby Da-Mik was stated to agree to pay the cost of the wells drilled and return to Erickson such moneys as required in the event of a dry hole in exchange for New Idria turning over to Da-Mik moneys received from Erickson, did not constitute true agreements, and if they did, were totally worthless to New Idria. This count alleged that petitioner caused the moneys received by New Idria in the amount of $182,156.04 to be paid over to himself or Da-Mik and caused the bills for the cost of drilling and equipping the wells to be rendered in his name or the name of Da-Mik, but that no costs were paid by petitioner or Da-Mik in excess of the moneys supplied to New Idria by Erickson, and that to the extent of $64,868.36 petitioner and Da-Mik had failed to return to New Idria the funds delivered to them. The count further alleged that petitioner and/or Da-Mik had received proceeds from the production of the McKnight and Waddell leases in the amount of $13,221.53. Under this count New Idria sought to have the assignments to Morris I. Jaffe, trustee, and Da-Mik cancelled, to have a constructive *185 trust imposed on these interests in recognition of New Idria's equitable rights therein, and to recover from petitioner and his two sons, jointly and severally, the amount of $78,089.89. Count three of the complaint alleged that petitioner while manager of New Idria's oil and gas division appropriated certain of its funds to his personal use and sought recovery thereof in the acount of $26,389.40. Count four of the complaint sought a restraining order enjoining petitioner and Martin from disposing of any of the New Idria stock then owned by them. No answer to the complaint was filed. During the year 1957 petitioner received from transactions involving the McKnight and Waddell leases the amount of $64,868.36. Petitioner also received from production from the McKnight and Waddell leases during the year 1957 the sum of $12,756.23. The above amounts were reported by petitioners on their 1957 income tax return in the following manner: Funds received for development
$46,868.36
Sale of oil and gas, Crane County,
Texas
5,734.01
Sale of oil and gas, Crane County,
Texas
7,022.22
Short-term gain on the sale, Crane
County, Texas Lease
9,000.00
Long-term gain on the sale of Crane
County, Texas Lease
4,500.00
Net taxable amount reported by
taxpayer
$73,124.59
Add: Gain
Nontaxable gain on the Crane
County, Texas Lease
4,500.00
*186 Beginning on October 21, 1957, a deposition of petitioner was taken in the suit by New Idria against petitioner and others. On October 23, 1957, the deposition was adjourned until a date to be later determined. It was resumed on November 19, 1957, and again adjourned to a date to be subsequently agreed upon. The transcript of this deposition consumes 475 pages. In late November or early December 1957 New Idria and petitioner agreed in principle to certain terms for a settlement of New Idria's suit against petitioner and others. The settlement agreement between New Idria and petitioner was executed on January 17, 1958. Under the terms of that agreement, petitioner agreed on the settlement date (1) to deliver or cause to be delivered to New Idria certified or bank cashier's checks in the amount of $25,000; (2) to sell and deliver to a securities broker or dealer certificates for 55,000 shares of the common stock of New Idria issued in the name of petitioner and in the possession of Texas Bank and Trust Company of Dallas; (3) to execute and deliver or cause to be executed and delivered to New Idria releases from each of certain enumerated persons or entities releasing New Idria from *187 any and all claims and causes of action of such persons or entities against New Idria; (4) to cause to be executed and delivered to New Idria a release from petitioner's two sons, releasing New Idria from any and all claims to any interest in 55,000 shares of the common stock of New Idria issued in the name of petitioner by reason of any purported gift of such shares of stock by petitioner to these children. Under the terms of the settlement agreement New Idria agreed on the settlement date (1) to execute and deliver to certain enumerated persons and entities releases, releasing such persons and entities from any and all claims and causes of action of New Idria arising on account of any transaction occurring prior to the date of the settlement agreement; (2) to cause Texas Bank and Trust Company of Dallas to execute and deliver to petitioner a release from any and all claims of such bank against petitioner based on any and all borrowings by New Idria from such bank; (3) to execute and deliver to American Automobile Insurance Company and the Home Indemnity Company, respectively, releases of all claims and causes of action of New Idria against such insurance companies arising out *188 of certain claimed infidelity or misconduct of a former officer or employee of New Idria as provided in certain written claims filed with those companies; and (4) to cause the suit pending in the United States District Court to be dismissed with prejudice against refiling as to all the defendants named in such suit. In addition, in order to settle and clear the title to the oil and gas leasehold estates which were a subject of such suit, New Idria and petitioner agreed to execute, acknowledge, and, on the settlement date, deliver or cause other persons and entities to execute, acknowledge, and deliver the necessary instruments to clear title to the McKnight and Waddell leases. Under the terms of the instrument agreed upon to be used for clearing the title to the McKnight and Waddell leases, the assignments to Morris I. Jaffe, trustee, and Da-Mik were cancelled; and it was agreed that neither of these entities nor petitioner was thereafter to have any interest in either of these leases. Petitioner and David Van Alstyne, Jr., president of New Idria, further agreed in the settlement to execute and deliver a mutual release with respect to indebtednesses owed by either to the other. *189 Paragraphs 11, 12, 13, and the concluding paragraph of the settlement agreement are as follows: The obligations of New Idria under this agreement shall be subject to the due performance by VanderLaan of all agreements of VanderLaan herein contained, including delivery of the instrument specified in paragraph 9 [the instrument to clear the title to the McKnight and Waddell leases] hereof, attached hereto and marked Exhibit D, duly completed by all of the persons and entities (other than New Idria) designated as signatories in such instrument together with such other instruments or documents required by counsel for New Idria evidencing the authority of the persons signing such instrument to execute the same. Similarly, the obligations of VanderLaan under this agreement shall be subject to the due performance by New Idria of all agreements of New Idria herein contained, to be performed on or prior to the Settlement Date. In the event of failure of performance by either party hereto on the Settlement Date the other party shall be excused from performance and shall be entitled to enforce performance by the defaulting party by suit for specific performance as well as for damages and *190 by any other available remedy. Dismissal of said suit as contemplated by paragraph 10 hereof shall not take place unless VanderLaan shall duly perform on the Settlement Date all agreements of VanderLaan herein contained. 12. "Settlement Date" as that term is used herein shall be December , 1957, unless extended by mutual agreement of the parties hereto. 13. This Settlement Agreement contains the entire agreement between the parties hereto relating to the subject matter of this Settlement Agreement. IN WITNESS WHEREOF the parties have caused this Agreement to be executed this 17th day of January 1958. NEW IDRIA MINING AND CHEMICAL COMPANY By /s/ C. Hyde Lewis President /s/ T. F. VanderLaan T. F. VanderLaan On or about December 21, 1957, James R. Kinzer, an attorney representing New Idria in the action brought by it against petitioner and others, sent certain releases to David Van Alstyne, chairman of the board of directors of New Idria, for his signature. These releases were to be delivered to the persons and entities specified in the settlement agreement on the settlement date. David Van Alstyne signed the releases on December 27, 1957, and returned them to Kinzer by *191 a covering letter of even date. These releases were held by Kinzer in his files until shortly prior to the settlement date when he went over the various documents involved therein with Morris I. Jaffe, the attorney for petitioners and others. The releases were thereafter retained by Kinzer and subsequently delivered to Jaffe on January 17, 1958, when these releases and other documents were mutually exchanged pursuant to the express terms of the settlement agreement. By letter dated December 23, 1957, Kinzer as attorney for New Idria forwarded to Jaffe, attorney for petitioner, copies of a draft of the proposed settlement agreement and other instruments to be executed in connection with the settlement. This letter contained the statement, "You undersand, of course, that New Idria's execution of the settlement agreement is contingent upon a satisfactory agreement being reached concerning the office furniture belonging to New Idria Mining and Chemical Company and presently situated in the Meadows Building." At an undisclosed time there was set up on a ledger sheet dated December 1957 contained in petitioner's records an account entitled, "Settlement with New Idria" which shows the *192 following: Date
Description
Debit
Credit
Balance
1957
Notes Payable - Republic National Bank
Paid by New Idria
(1) $10,000.00
Notes Payable - David Van Alstyne
(2) 10,000.00
Accounts Receivable - New Idria Mining &
Chemical Co.
(3) $ 9,015.70 [1]
Note Receivable - New Idria
4,487.27
Lease & Well Equipment
(4) 8,210.62
Bell Lease
Coline Lease
Kidd
Inventory
(5) 2,131.08
Cash
(6) 10,000.00
Accrued Taxes Payable
(7) 3,303.93
$10,540.74
Item 6 set forth in this account as "Cash" represented petitioner's check to New Idria in the amount of $10,000 dated (January 17, 1958. Continental Allied Producing Company (hereinafter called CAPCO) is a corporation. The first minutes contained in its minute book which are dated April 24, 1957 contain the following: RESOLVED: That the function of the corporation shall be as an operating company for the account of T. F. Vanderlaan and that all assets and liabilities acquired *193 or accumulated in process of operation shall be charged accordingly. Under date of July 17, 1957, a letter agreement was executed by petitioner and Glenn T. Lang, Jr., regarding an oil and gas property known as the Jay McGee lease. This letter agreement identified a farmout which Lange stated he had received from Pan American Petroleum Company by the terms of which he was obligated to drill or cause to be drilled a test well. This letter agreement further provided: I agree to proceed with the drilling of said well and to comply with all of the terms of the said farmout agreement. Upon completion of said first test well, whether a dry hole or commercial producer, I will assign to you any and all monies, properties, rights, proceeds, or privilege, earned by me by my compliance with said farmout agreement, subject to the reservation hereinafter contained. The reservation referred to is that Da-Mik Oil Company, with whom I am associated in this venture, will receive a 1/16 overriding royalty interest, said override being further subject to any landowner's royalty or other overriding royalty interest that might exist. In consideration of the above, and for other good and valuable *194 consideration, you agree to furnish any and all finances, administrative, geological and engineering work, to enable me to undertake and complete this program. It is specifically understood and agreed that no part of the farmout agreement is being assigned herein, but that this agreement is to assign to you, if, as and when earned by me, the above referred to interests. Also on July 17, 1957, a letter agreement was executed by CAPCO, by T. F. Vanderlaan, president, and Glenn T. Lang, Jr., regarding the Jay McGee lease. The letter agreements of July 17, 1957, between Glenn T. Lang and petitioner on the one hand and between Glenn T. Lang and CAPCO on the other are identical in every respect with the exception of the addressee and the respective acceptances. The agreement between CAPCO and Lang was prepared and executed several days prior to the agreement between petitioner and Lang. On July 18, 1957, a letter agreement was executed by petitioner and CAPCO by Lynn Elliott, vice president, regarding the Jay McGee lease. This agreement provided for a transfer of the obligations required of petitioner under the letter agreement executed by him and Glenn T. Lang, Jr., on July 17, 1957, and *195 further provided as follows: It is understood that you will enter into all agreements necessary for the drilling of the aforementioned well, and that you will pay any and all expenses incurred in connection with the drilling and equipping of said well in the event it is a commercial producer, but that all such sums expended by you will be charged to my account, and I hereby agree to reimburse you for all such expenses. Anything herein to the contrary notwithstanding it is specifically understood and agreed that should the test well referred to be a dry hole, I will promptly reimburse you for all monies expended by you, and hold you free and clear of any further obligations in connection with this well or any others on the subject lease. It is further understood and agreed that nothing contained herein is intended or should be interpreted as constituting a partnership, but to the contrary you agree only to act as operator until such time as this venture results in a dry hole, or so long thereafter as said well continues to be a commercial producer. On June 10, 1957, a letter agreement was executed between Mark Eidelbach and CAPCO by Lynn Elliott, vice president, regarding an *196 oil and gas property known as the Williams lease. This agreement constituted a farmout by Eidelbach to CAPCO wherein CAPCO obligated itself to drill a well according to certain specified conditions. CAPCO was to receive a full six-eighths of the usual seven-eighths leasehold interest upon full compliance with the terms of the agreement. On October 12, 1957, a letter agreement was executed between CAPCO by Frank M. Tye, Jr., and W. F. Tucker, owner of Tucker Drilling Company, regarding the drilling of a test well on the Williams lease. This agreement called for the Tucker Drilling Company to drill a well to a depth of 6,500 feet or to fluid if encountered at a lesser depth. The consideration for the drilling of the well in the amount of $40,500 was, under the agreement, to be placed in escrow at the Texas Bank and Trust Company at Dallas, Texas, and was to be due and payable when the subject test well was logged to 6,500 feet or fluid encountered. On November 18, 1957, CAPCO, by letter, informed the Texas Bank and Trust Company that the Tucker Drilling Company had drilled and completed the well called for in their letter agreement of October 12, 1957, in accordance with the terms *197 and provisions thereof, and directed the bank to pay to Tucker Drilling Company the $40,500 in the escrow deposit. On December 20, 1957, CAPCO by Lynn Elliott, vice president, sent a letter to Mark Eidelbach calling his attention to his agreement to assign to it a full six-eighths interest in the Williams lease upon completion of drilling of a test well and to the fact that the test well had resulted in a dry hole and directing him to make this assignment to petitioner. By an instrument dated November 25, 1957, and acknowledged as executed on December 27, 1957, Mark Eidelbach assigned to petitioner an undivided seven-eighths interest in the Williams lease subject proportionately to an overriding royalty interest described therein. Lynn Elliott is a lawyer who from November 1956 until July 1957 was employed by New Idria at a salary of $9,000 a year in the Dallas office of which petitioner was manager. He was discharged by New Idria in July 1957 and thereafter until March 1958 was employed by petitioner at the same annual salary. Elliott drafted both the identical letters except as to addressee dated July 17, 1957, with respect to the McGee lease. A total amount of $40,138.72, *198 including the $40,500 escrow fund turned over to Tucker Drilling Company offset by a $660 refund from Tucker was paid in 1957 by CAPCO as intangible expenses of developing the Williams lease and all such amounts were charged on CAPCO's books as accounts receivable from either petitioner or Da-Mik. In December 1957 Da-Mik made a $30,000 cash payment to CAPCO with respect to the escrow account which had been turned over to Tucker Drilling Company. A total amount of $16,182.52 was paid in 1957 by CAPCO as intangible development expenses of the McGee lease and charged on CAPCO's books as accounts receivable from petitioner. In addition petitioner paid $1,531.70 as intangible development expenses on the McGee lease. CAPCO had available to it $100,000 which it had borrowed from Gas-Tex, a corporation the stock of which was owned by petitioner. Gas-Tex had borrowed $100,000 from Greater Mississippi Investment Company, a Mississippi corporation, 64 percent of the stock of which was owned by petitioner in 1956 and 1957. Petitioner, on his 1957 income tax return, deducted the amount of $10,540.74 as a business expense denominated as "Settlement Lawsuit." This deduction was taken in computing *199 the net profit or loss from his business of "Discovery and Development of Oil and Gas Properties" without any business name given on a Schedule C separate from that on which he reported profits and losses from a similarly designed business for which the business name of "Da-Mik" was given. Respondent in his notice of deficiency disallowed this claimed deduction with the following explanation: (c) It is determined that your claimed deduction of $10,540.74 for alleged cost of settlement of a lawsuit is unallowable, being unsubstantiated as to the amount paid within the taxable year. Petitioner, in addition to contending that the claimed deduction is proper, contends that he improperly reported as income the amount of $73,124.59 received in 1957 with respect to the McKnight and Waddell leases, contending that under the settlement of the lawsuit he renounced all claim to these amounts in 1957 or they were impressed with a constructive trust in that year. Petitioner, on his 1957 income tax return, reported $9,000 as a short-term capital gain from the sale of a "Crane Co. Lease" and $9,000 as long-term capital gain from a similar sale, 50 percent of which was included in his taxable *200 income as reported. Respondent determined that the entire $18,000 constituted ordinary income to petitioner with the following explanation: (f) It is determined that you received a drilling contribution of $64,868.36 in 1957 from Lennart G. Erickson of which you reported only $46,868.36 as ordinary income. The remaining $18,000.00 which you reported as capital gain sales proceeds is removed from that category and included as ordinary income. * * * Petitioner, on his 1957 income tax return, claimed deductions for intangible development costs in the total amount of $77,067.49, of which $36,404.32 was claimed on the Schedule C which showed no business name and $40,663.17 on the Schedule C showing the business name of "Da-Mik." Respondent in his notice of deficiency disallowed $57,852.94 of the claimed deduction for intangible development costs with the following explanation: (e) It is determined that your claimed deduction of $57,852.94 for intangible oil well drilling costs is unallowable, because you were not the owner of an operating mineral interest in the Jay McGee Lease in Crane County, Texas, or in the M. M. Williams Lease in Tom Green County, Texas, during the time when *201 such drilling costs were incurred. Opinion The issues here involved are entirely factual. The parties are agreed that petitioner's books were kept on a cash receipts and disbursements basis and his returns filed on that basis. Each issue is concerned with whether certain amounts received by petitioner were properly includible in income or certain amounts deductible under the cash method of accounting. The first issue is whether petitioner improperly reported as income the amount of $73,124.59 representing the excess of the amounts received by him personally or by Da-Mik in connection with the McKnight and Waddell leases over the amounts actually disbursed by him or Da-Mik in connection with those leases. In connection with this issue neither party takes the position that income of Da-Mik is not income of petitioner, although in connection with another issue herein respondent takes the position that the evidence is insufficient to support the conclusion that Da-Mik was merely a name under which petitioner transacted business. The amount of $73,124.59 reported by petitioner is comprised in part of $46,868.36 reported on the schedule relating to the business done under the name *202 Da-Mik designated as "Funds received for development." This amount appears to represent funds which Erickson paid to New Idria and petitioner caused New Idria to turn over to Da-Mik but which were not disbursed by Da-Mik during the year 1957. The amount of $12,756.23 of the $73,124.59 total represents amounts received from sales of oil and gas from the McKnight and Waddell leases, part of which was reported on Schedule C under the business name Da-Mik and part on Schedule C under petitioner's name without a business name. The balance of the amount represents reported short-term and long-term capital gain on the sale of leases, which respondent determined to be ordinary income, another issue in this case. Petitioner does not contend that he did not receive the amounts comprising the $73,124.59 but argues that New Idria claimed in its suit against him that it was the rightful owner of these moneys, that this suit was settled before the end of 1957, and that under the settlement he effectively renounced all claim to these funds during the year 1957. Petitioner relies upon a number of cases which he cites for the proposition that the claim of right doctrine is not applicable to amounts *203 to which the receipient has renounced all claim before the end of the taxable year. These cases have no application to the facts in the instant case. Irrespective of whether New Idria's suit against petitioner was settled in 1957 as he contends or 1958 as respondent contends, the settlement did not require petitioner to return the amounts received by him in connection with the McKnight and Waddell leases Under this settlement petitioner was required to transfer to New Idria 55,000 shares of its stock, to pay New Idria $25,000 in cash, and to transfer to New Idria any interest he might have in the McKnight and Waddell leases. In fact a more reasonable inference from the fact that New Idria specifically claimed the $73,124.59 [1] from petitioner in its suit against him but the return of this amount was not specified in the settlement, is that under the settlement petitioner was permitted to retain this amount. The adjustments made by petitioner on his books in arriving at the claimed loss from the New Idria settlement of $10,540.74, the details of which are set forth in our findings, contains no reference to the $73,124.59 which the petitioner had reported as received from the McKnight *204 and Waddell leases. Petitioner attempts to justify his position on the theory that the 55,000 shares of New Idria stock equalled or exceeded the $73,124.59 and that the value of the interests in the McKnight and Waddell leases transferred by petitioner to New Idria was in excess of $80,000. We have made no finding of the value of the New Idria stock since the only evidence thereof was a recollection of petitioner of which he was uncertain. However, if we assume that the 55,000 shares had a fair market value in excess of $73,124.59, this still does not make the transfer of the stock equivalent to a renouncing of claim to the $73,124.59. There were three counts in New Idria's complaint seeking recovery from petitioner, and there is nothing in the evidence to show that the settlement went only to count two. Insofar as the record shows, the transfer by petitioner to New Idria of 55,000 shares of its stock may well have been in settlement of count one of the complaint. Petitioner has failed to show that he renounced claim to the $73,124.59 *205 prior to the end of 1957. Petitioner points out that New Idria contended in its complaint that the $73,124.59 received by petitioner in connection with the McKnight and Waddell leases was held by petitioner for it under a constructive trust. Petitioner cites language in in support of his position that the amount was funds held in trust and not income. In , we stated, "If any constructive trust existed which affected petitioner's income tax for 1926, its existence should have been proved." We pointed out therein that the taxpayer there involved had settled suits against him that questioned his ownership of the stock there in issue but had denied the allegations in the suits against him which questioned his ownership of the stock. In the instant case no answer to the allegations in New Idria's complaint was filed, but certainly we cannot assume without proof that petitioner admitted the allegation as to the existence of a constructive trust or that such a constructive trust did in fact exist. In fact, this allegation in New Idria's complaint was only an alternative allegation. We therefore *206 hold that petitioner has failed to show that the $73,124.59 reported by him in 1957 with respect to the McKnight and Waddell leases were not funds which he received and remained entitled to retain in that year. Therefore this amount was properly includible in petitioner's income in 1957 unless, as petitioner contends in the alternative, the amount of $46,868.36 was pledged for development and for that reason did not constitute taxable income. Petitioner contends that the $46,868.36 received by Da-Mik from New Idria, which amount New Idria had received from Erickson, was held by Da-Mik to be used for development of the McKnight and Waddell leases and was thus "pledged for development." Without discussing petitioner's contention in detail, we will assume that if the evidence supported petitioner's contention that the $46,868.36 constituted funds received by him which he had no right to retain but could only disburse in accordance with a prior agreement as development proceeded on the McKnight and Waddell leases, such funds would not be income but merely funds which he was temporarily holding for disbursement. The evidence does not support this contention. A contention that the $46,868.36 *207 was being held by petitioner at the end of 1957 to be used by petitioner solely for development of the McKnight and Waddell leases, or as petitioner states "pledged for development," is entirely inconsistent with petitioner's theory that New Idria's suit against him had been settled by the end of 1957 and the obligation of the parties thereto fixed. However, since petitioner's position that the $46,868.36 was pledged for development is an alternative one, we will ignore this inconsistency. The fact that petitioner's connection with New Idria had been severed before the end of 1957 is clear. It is also clear that any obligation of petitioner (or Da-Mik) to use funds which came to him through New Idria from Erickson for development of the McKnight and Waddell leases would be because of an agreement between New Idria and Da-Mik. The reasonable inference from the evidence is that any such agreement that might have existed between New Idria and Da-Mik had been rescinded by New Idria before the close of 1957. The only contrary evidence is the statement by petitioner in the course of testimony on the arrangement between New Idria and Da-Mik that the $46,868.36 was "used for" development of *208 the McKnight and Waddell leases. [2] If the funds had actually been "used" for development of the McKnight and Waddell leases by the end of 1957, the amount should have appeared on petitioner's books as a disbursement and the evidence does not so show. Certainly this amount was not used to develop these leases after the end of 1957, since as of the close of 1957 New Idria and petitioner were well on the way to settling their dispute. We therefore hold that the evidence fails to show that the $46,868.36 was pledged for development at the end of 1957. *209 The next issue concerns the propriety of the deduction by petitioner in 1957 of $10,540.74 as a loss on settlement of New Idria's suit. The evidence shows that the $10,000 which was paid in cash by petitioner as a result of the settlement was paid on January 18, 1958. Since petitioner is a cash basis taxpayer, this amount if deductible, would be deductible in 1958, the year in which it was paid. Petitioner contends, however, that a loss from settlement of the lawsuit of $10,540.74 is supported by the entries on petitioner's books as of December 1957 showing charges of gains on losses under this settlement. If the $10,000 cash payment made in 1958 is eliminated from this computation, the debits exceed the credits by only $540.74 unless as petitioner contends the $10,000 credit of a note owed by petitioner to Van Alstyne should be eliminated as not being a part of the settlement agreement between petitioner and New Idria. The settlement agreement, itself, shows, however, that this was a part of the settlement since under the settlement mutual releases of indebtedness were to be given by petitioner and Van Alstyne. In any event, since petitioner was a cash basis taxpayer, there is *210 no reason to assume that he had reported as income such items as accounts and notes receivable from New Idria and would therefore be entitled to deduct as a loss any amount thereof not offset by credits under a settlement whereby he relinquished his right to receive such amounts. This is the same situation as a taxpayer on the cash basis who does not report payments until received not being entitled to deduct an uncollectible account as a bad debt because the amount of such account has never found its way into his income. Therefore, irrespective of whether New Idria's suit against petitioner was settled in 1957 or 1958, petitioner has failed to show that he had in 1957 a deductible loss from the settlement. Petitioner in the alternative contends that he improperly reported on his 1957 Federal income tax return $4,335.42 of salary from New Idria which in fact he did not receive during that year or at any other time. Petitioner is a cash basis taxpayer, and if he did not receive either in cash or property of value the salary due him from New Idria, and if he had no unrestricted right to receive such salary in 1957, the amount due him from New Idria as salary is not properly includible *211 in his income. This question is also one purely of fact. If the $12,499.92 salary from New Idria reported by petitioner on his 1957 income tax return includes the amount of $4,335.42 which he neither actually nor constructively received in that year, petitioner's income should be reduced by this latter amount. The evidence in this respect is inconclusive. Petitioner testified that there was an amount of about $10,000 salary which was due to him by New Idria which he did not receive but which he reported on his income tax return for 1957. [3] Petitioner's ledger entries show an amount receivable as salary from New Idria by petitioner in 1957 as $4,335.42. At another point in his testimony petitioner stated that his 1957 income tax return was prepared by Gus Hanson, that "I just perused the return and looked at the total tax paid and I felt that I hadn't made any money particularly and I signed the return and we sent it in." Gus Hanson testified as a witness for petitioner but made no statement with respect to the source of the amount included in petitioner's return as salary from New Idria. Petitioner never stated his base yearly salary from New Idria in order that the amount reported *212 could be compared with the amount due him, nor did he produce a copy of the Form W-2 shoing his salary from New Idria in 1957 or explain why he did not do so. On the basis of the evidence of record we hold that petitioner has failed to prove that he included in the income reported in this 1957 income tax return, $4,335.42 as salary from New Idria which he did not in fact receive in that year. *213 The next issue is whether the amount of $18,000 reported by petitioner is a gain from the sale of leases was ordinary income from a drilling contribution. Petitioner offered no evidence on this issue and made no arguments with respect thereto independent of his evidence offered and arguments made with respect to his contention that none of the amounts received by him with respect to the McKnight and Waddell leases was income in 1957. We therefore decide this issue against petitioner for failure of proof. The last issue is again a purely factual one. It is respondent's contention that petitioner is not entitled to the deduction of $57,852.94 for intangible oil well drilling costs because he was not the owner of an operating mineral interest in the leases during the time when the drilling costs were incurred. The claimed intangible drilling costs are composed of two amounts as follows: McGee lease, Crane County
$17,714.22
Williams lease, Tom Green County
40,138.72
$57,852.94 The $17,714.22 was a portion of the deduction for intangible drilling costs claimed by petitioner on the Schedule C in his own name without a business name, and the $40,138.72 a portion *214 of a similar expense claimed on Schedule C in petitioner's name operating under the business name, "Da-Mik." With respect to the McGee lease, respondent contends that no explanation has been offered with respect to the two letter agreements, one stating that the interest is to be assigned to CAPCO, and the other, that it is to be assigned to petitioner. With respect to the Williams lease, respondent argues that there was not even a purported transfer of the interests in this lease to petitioner prior to the the completion of the dry hole and that the intangible drilling costs involved were charged according to the records of CAPCO, except for a few minor items to the accounts of Da-Mik. It is respondent's contention that there is no creditable evidence to support the contention that Da-Mik was a name under which petitioner individually did business. Respondent argues that even though petitioner testified to this fact, that since in the deposition given by petitioner in October and November 1957 in connection with the New Idria suit against him and others he unequivocally stated that Da-Mik was the name under which his older son, David, did business and that Da-Mik was David's business, *215 neither statement is worthy of belief. The deposition given by petitioner under oath in the New Idria suit was received in evidence upon respondent's offer thereof solely for the purpose of impeachment of petitioner who was on the witness stand and had been confronted with some of the statements therein at the time the deposition was offered. Respondent contends that the statements in the deposition in a number of instances are so inconsistent with the statements of petitioner on the witness stand that petitioner's entire testimony should be ignored as not being worthy of belief. The deposition goes into considerably more detail with respect to a number of transactions than petitioner's testimony in the instant proceeding but except with respect to the ownership of the business operated as Da-Mik, we see no direct inconsistency with petitioner's testimony herein in any material respect. Petitioner was questioned while testifying in the instant case with respect to the testimony in the deposition regarding the ownership of Da-Mik and freely admitted that he had so testified in the deposition. In his testimony in the instant case he gave no explanation of the inconsistency of his testimony *216 with the sworn statements made by him in the deposition. Petitioner argues on brief that during the negotiations with respect to the settlement of the New Idria suit he became aware that a business which he financed for the benefit of his minor son was in reality his business and that this explained the inconsistencies in his testimony in the instant case and in the deposition. In the instant case there is no direct testimony that petitioner's sons were minors during the year 1957 even though reference to them as minors is made throughout the New Idria suit against petitioner and his deposition taken in connection therewith. If there were no other evidence of the ownership of the business operated as Da-Mik in the instant case, we would be inclined to agree with respondent that at a minimum petitioner had failed to meet his burden of proof that Da-Mik was in fact his business. However, petitioner's income tax return is in evidence in the instant case and shows that on a separate Schedule C from that reporting operations under his name without a business name, he reported business income operating under the name "Da-Mik" and this Schedule C shows a net income reported of $10,148.25. *217 It also shows that it was on the Da-Mik Schedule C that the "funds for development" in the amount of $46,868.36 received from New Idria, which in turn had received the money from Erickson, was included. We have sustained respondent in his contention that this amount is properly includible in petitioner's income. The reporting by petitioner of the income of the business operated under the name "Da-Mik" is itself independent evidence that Da-Mik was petitioner's business, and we are convinced from this evidence that it in fact was, and that the income and deductions attributable to the Da-Mik operation are properly includible in petitioner's income. We will therefore consider this issue with respect to the intangible drilling costs on the basis that the income and deductions of both petitioner's individual operations and the operations under the name of Da-Mik are properly includible and deductible by petitioner. Petitioner argues that CAPCO was purely an agent acting for him in all arrangements made with respect to the McGee and Williams leases, that the expenses paid by his agent and charged to him are the same as expenses paid by him, and that therefore amounts paid by CAPCO were *218 in fact paid by him (including amounts charged to Da-Mik) and are properly deductible by him. Petitioner relies on a number of cases holding that items paid by a cash basis taxpayer with borrowed money must be deducted, if otherwise properly deductible, at the time the lender pays them on the borrower's behalf and not at the time the borrower repays the loan. One of the cases so relied on by petitioner is , affd. (C.A. 5, 1952). In the McAdams case, it was clear that not only was the taxpayer the co-owner of the lease involved, but also in the year of the drilling the taxpayer was legally obligated to pay the driller his share of the drilling costs. He discharged a portion of this obligation with money borrowed from a bank and the balance with funds loaned to him for that purpose during the year 1941 by the other co-owner of that lease. We there cited (at page 235) a number of cases holding that expenses paid with borrowed funds by a cash basis taxpayer are deductible in the year actually paid and not in the year of repayment of the borrowed funds. The instant case does not contain the clear-cut facts that are *219 present in the case of While the evidence is not unmistakably clear that the McGee and Williams leases were to be petitioner's property and that in taking the Williams lease CAPCO took it on behalf of petitioner, we believe the evidence as a whole is sufficient to show that such was the situation. The purpose for which CAPCO was organized as set forth in our findings was to be an operating company for the account of T. F. Vanderlaan. Petitioner testified that he considered CAPCO his agent both for the taking of the leases and drilling of the wells. Elliott testified to the same general effect. However, the documentary evidence does not support such a broad conclusion. Petitioner as an individual entered into a written agreement by letter with CAPCO with respect to drilling on the McGee lease whereby it was agreed that CAPCO would enter into all necessary agreements for drilling of wells on such lease and pay all expenses incurred in connection with the drilling and equipping of such wells, and in the event the well was a commercial producer petitioner agreed to reimburse CAPCO for all expenses. It was understood that if the well were not a commercial *220 producer that petitioner would reimburse CAPCO for the expenses of drilling. This more nearly resembles an agreement to hire a driller to drill wells, the driller to be paid whether or not a producing well results. It also appears to contemplate that the expenses of drilling will be with the driller's own funds and that upon conclusion of the drilling the driller will be paid for his services during the drilling. While an indebtedness is created by such an arrangement and the leaseholder becomes obligated to the driller, as we view the arrangement here, it would be no different until paid from any other account payable owed by a cash basis taxpayer and, therefore, not deductible until paid. ; 1200-1201 (1931). The arrangements with respect to the Williams lease between petitioner and CAPCO are not all covered by written instruments. The fact that the assignment of the interest in the Williams lease to petitioner by Eidelbach was drawn on November 25, 1957, only a few days after the completion of the drilling on that lease on November 18, 1957, but was not executed until December 27, 1957, after a letter of December 20, 1957, from CAPCO directing *221 Eidelbach to make the assignment to petitioner, taken in conjunction with petitioner's testimony that it was intended that the interest in this lease be assigned to him and the evidence showing that CAPCO was organized to be an operating company for petitioner, have led us to conclude that petitioner was in fact the owner of the right to have an assignment of the interest in the Williams lease prior to the drilling thereon. There is no written evidence of the agreement between petitioner and CAPCO for the drilling of the wells on the Williams lease. In this state of the record we have concluded against petitioner that in this instance, also, CAPCO was operating as the driller to be paid for this service by petitioner, and, therefore, petitioner, a cash basis taxpayer, is entitled to deduct only the amounts actually paid to CAPCO in 1957. The record is relatively clear that the only amount of the drilling costs on the McGee lease paid by petitioner in 1957 was $1,531.70. We hold that to this extent petitioner is entitled to a deduction for intangible drilling costs in the year 1957 with respect to this lease and sustain respondent in his disallowance of petitioner's claimed deduction *222 in that year to the extent of $16,182.52. The evidence with respect to the Williams lease is less clear. Petitioner testified with respect to Eidelbach's coming in to discuss this lease with his geologist, Lafferty, and Lafferty's talking to him about it, and then stated: We discussed it and I agreed to drill the well to acquire the block of acreage or at least to commitment that was inherent in the leases. We did take the contract. We let the contract with the Tucker Drilling Company and did drill the well. I put the money in escrow at the Texas Bank & Trust to pay for it and it was released to Tucker Drilling Company when they had completed their contract. Petitioner argues from this that he actually paid the $40,500 of escrow money that was released by CAPCO to the Tucker Drilling Company. It appears, however, that petitioner in his testimony was making no precise distinction between CAPCO, his corporation, and himself as an individual. From the vouchers with respect to the Williams lease placed in evidence, it appears that in 1957 and apparently in December of that year petitioner (his Da-Mik operations) paid in cash to CAPCO with respect to the drilling costs in connection *223 with the Williams lease the amount of $30,000, and we have so found. There is no indication from this voucher which also contains a charge to petitioner's account and two charges with respect to notes of the Greater Mississippi Investment Company that there was any actual payment to CAPCO by petitioner in 1957 with respect to the drilling on the Williams lease in addition to the $30,000. We therefore hold that petitioner is entitled to a deduction of $30,000 as intangible drilling costs with respect to this lease and sustain respondent in his disallowance of the claimed deduction with respect to the Williams lease to the extent of $10,138.72. Decision will be entered under Rule 50. Footnotes
1. The item is entered in the above account on the books in two entries as follows: ↩
Description
Amounts
Salaries
$4,335.42
Accounts Receivable
4,680.28
$9,015.70
1. The total amount claimed is somewhat more than this amount but the description in the suit identifies the amounts as representing the same funds.↩
2. Petitioner testified as follows in this regard: Q. Did Mr. Erickson furnish these funds for development of these properties in Crane County? A. Yes, sir, he did. Q. Calling your attention specifically, Mr. Vanderlaan, to the item of $46,000 on the exhibit marked 13, would you tell the Court what that is? A. That was funds that were received from the Erickson contract. Q. You mean it was received from Erickson pursuant to the contract? A. That's right. These funds came into New Idria and were turned over to them. Q. What happened then? A. These funds were received for the development, the drilling, and completion of the wells in Crane County. Q. Did New Idria then in turn turn this collection from Mr. Erickson over to you? A. Yes, sir. Q. Tell the Court what happened with respect to that transaction. A. Well, the Erickson funds that came in were endorsed or transferred, on their receipt were transferred, to the DA-MIK account. Q. Now, DA-MIK was the d/b/a of yours? A. Yes. Q. In fact, you received the funds? A. That is true. Q. Were the funds pledged for development? A. I beg your pardon? Q. Tell the Court whether the funds from Erickson were pledged for development of the Crane County properties. A. These funds were set aside and put in the DA-MIK account and as the expenses came in from New Idria, who was the operator, they billed the expenses to DA-MIK and DA-MIK paid these expenses. Q. Were the funds pledged by New Idria and yourself and Erickson for the development of the properties in Crane County? A. Yes, sir, they were. Q. Had you discussed this farm-out arrangement between yourselves and New Idria with the chairman of the board? A. Yes, sir, I did. Q. Was he in agreement with it at the time you talked to him? A. Yes, sir, he had full knowledge. Q. Were the funds at all times received by you through New Idria from Erickson used by you or your d/b/a DA-MIK for development of the Crane County properties? A. Yes, sir, they were. Q. Was the $46,000 which appears on this exhibit used for the development of the properties? A. Yes, it was.↩
3. Q. Would you tell the Court, Mr. Vanderlaan, about the item of $10,540 deduction which you took on your income tax return in 1957 as an expense of lawsuit? A. That item actually amount to what salary that I had left on the books of New Idria Mining & Chemical Company that I hadn't received at the time that I was relieved of my position with them. Q. Now, would you explain that to the Court, please, sir? A. At the time I was employed by New Idria since I was having to scramble for moneys to make the payroll and those things I wasn't drawing all of my salary. It was going on the books. They were paying the withholding and that stuff on it but I wasn't actually taking the money and the net result at the settlement was about $10,000. Q. Was this amount of income that was reported that was your salary, did you report that as your salary? A. Yes, sir, I did. Q. And the tax was withheld by New Idria on that amount? A. Yes. Q. State whether or not you received that amount. A. I did not receive it.↩